IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

JOHN M. HIGH, )
 )
    Plaintiff, )
 )
 ) CIV-12-969-HE
v. )
 )
CAROLYN W. COLVIN, )
  Acting Commissioner of Social )
   Security Administration[1], )
 )
    Defendant. )

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying his applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, Acting Commissioner Colvin is substituted for former Commissioner Michael J. Astrue as the Defendant in this action. No further action need be taken to continue this action. 42 U.S.C. § 405(g).

I. Background

Plaintiff applied for benefits in July 2009, alleging that he became disabled on January 31, 2009. At that time, he was 46 years old. Plaintiff alleged disability due to type II diabetes, diabetic neuropathy, vision impairment, depression, and high blood pressure. Plaintiff stated that he stopped working due to his medical impairments. He previously worked as a restaurant manager and user support analyst, and he completed one year of college and vocational training in computer information systems.

Plaintiff completed a questionnaire concerning his usual daily activities in December 2009. (TR 157-164). In this report, Plaintiff stated that he generally watched television, did not drive but used public transportation, cared for his minor child and pets, did not participate in social activities due to foot pain, could concentrate only 5 to 10 minutes, and used a walker or cane when leaving his home.

In November 2010, Plaintiff testified at a hearing before Administrative Law Judge Moser ("ALJ"). (TR 27-58). A vocational expert ("VE") also testified.

The ALJ subsequently issued a decision in which the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 31, 2009, his alleged disability onset date. (TR 16). Following the well-established sequential evaluation procedure, the ALJ found at step two that Plaintiff had severe impairments of high blood pressure, diabetes, and neuropathy. In connection with the step two finding, the ALJ found that Plaintiff had a medically-determinable mental impairment due to depression. Following the agency's established procedure for evaluating the severity of mental impairments, see 20 C.F.R.

§404.1520a, 416.920a, the ALJ found that Plaintiff's mental impairment due to depression was not severe. The ALJ also found that Plaintiff's complaint of decreased vision was not a severe impairment.

At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal the requirements set forth in the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 and the impairments were therefore not disabling *per se*. In connection with this finding, the ALJ specifically considered the requirements of listing 9.08 for diabetes mellitus and listings 4.02 and 4.04 in relation to Plaintiff's hypertension.

At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform work at the light exertional level.[2] Relying on the VE's testimony concerning the requirements of Plaintiff's previous jobs, the ALJ found at step four that Plaintiff was capable of performing his past relevant work as a restaurant manager (described as "light and skilled") and user support analyst (described as "sedentary and skilled"). (TR 21-22).

Plaintiff contends that there is not substantial evidence to support the ALJ's finding that his mental impairment is not severe, that the ALJ improperly performed a credibility analysis, that the ALJ erred in failing to consider the effects of Plaintiff obesity on his other impairments, and that the ALJ's RFC finding is not supported by substantial evidence. Finally, Plaintiff contends that the ALJ erred in failing to order a consultative visual

---

[2]Light work is defined as work involving lifting objects weighing up to 20 pounds at a time, frequently lifting or carrying objects weighing up to 10 pounds, and mostly walking or standing, or sitting with pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

examination for Plaintiff.

The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

II. Standard of Review

In this case, judicial review of the final Commissioner's decision is limited to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

III. Medical Record

The medical record reflects treatment of Plaintiff for diabetes beginning in October 2007, when it was noted by his treating medical clinic examiner that his diabetes was poorly controlled due to noncompliance with medications for three months. (TR 275). In 2008, Plaintiff was treated for a sprained ankle and an eye infection. (TR 193-195, 273-274). His

4

treating clinic examiner noted in June 2008 that Plaintiff was noncompliant with diabetes medications. (TR 274).

In March 2009, Plaintiff was treated at a hospital emergency room for a dental abscess and hypertension. The examining doctor noted that Plaintiff was "mildly overweight" and that he gave a history of diabetes and neuropathy.

In April 2009, Plaintiff reported to his treating medical clinic examiner that he had been taking his diabetic medications for only one month. (TR 271). Two weeks later, Plaintiff complained of severe neuropathic pain in both feet that was burning, sharp, and tingling. (TR 271). The examiner prescribed Neurontin® for diabetic neuropathy and noted that Plaintiff's diabetes was "improving" on medications. (TR 271).

In May 2009, Plaintiff reported to the treating clinic examiner that he was "doing fine" and that the "Neurontin [had] helped his neuropathy a lot, but [his] pain [was not] gone yet." (TR 270). The examiner noted that his hypertension was improved on medication, and he was advised to increase the dosage of Neurontin® until he experienced pain relief. (TR 270). In May 2009, he was treated with an antibiotic for skin infections. (TR 269). In June 2009, Plaintiff sought emergency room treatment for a knee injury caused by "moving furniture." (TR 206-207). He was treated for a knee sprain and prescribed a knee immobilizer. (TR 206-207).

In June 2009, Plaintiff complained to his treating medical clinic examiner that he was experiencing pain in his legs and feet, especially at night. (TR 267). In July 2009, Plaintiff began treatment at a new medical clinic. At this clinic, ARNP Silverstien-Alpert noted

Plaintiff's complaint of worsening neuropathic pain, causing him to be unable to stand on his feet for more than two hours. (TR 225-227). Plaintiff also reported difficulty seeing his medication bottles, and he reported no change in his memory or mood. (TR 225-226). He was not doing glucose testing and was given the equipment to do so. He was prescribed Naprosyn®, a non-steroidal anti-inflammatory medication, for swelling in his feet, and he was encouraged to raise his legs when he was in bed or sitting down. His blood pressure medication was changed. (TR 225).

On July 16, 2009, Plaintiff went to a hospital emergency room where he complained of diabetic neuropathy with lower extremity pain and swelling. He was prescribed Lortab® to be used as needed and advised to rest, ice and elevate his legs. He was then "discharged home in good condition." (TR 213-214). Testing, including a venus scan and sonogram of Plaintiff's left lower extremity, was interpreted as showing no deep vein thrombosis. (TR 217-218).

The following day, Plaintiff was treated at his regular medical clinic where his diabetic medications were changed and he was prescribed compression hose and Lortab® for edema and neuropathy. (TR 229-230). Two weeks later, Plaintiff reported he was forgetting to check his glucose levels but had no diabetic symptoms. He was prescribed gabapentin (the generic form of Neurontin®) for neuropathy. (TR 232).

In August 2009, Plaintiff underwent vision testing, which the examining physician noted showed background diabetic retinopathy in one eye. Plaintiff was advised to return one month later to recheck his eyeglass measurements. (TR 222).

In September 2009, Plaintiff was prescribed medication for gastrointestinal reflux disease, and in September 2009 he was treated by ARNP Silversein-Alpert for an infected toe. (TR 240-241, 295). At these office visits, Plaintiff reported no change in his strength or range of movement, no numbness or tingling, and no change in his memory or mood. (TR 240, 295).

Later that same month, Plaintiff was treated by ARNP Meyer who noted Plaintiff complained the previously-prescribed neuropathy medication was not working and he had persistent pain, numbness, and tingling. (TR 299). He was advised to continue his medications and prescribed a sleeping aid medication. (TR 300).

In September 2009, Plaintiff sought treatment for depression symptoms at a community mental health center where he was evaluated by Ms. Schultz. He requested assistance obtaining disability benefits and health care, and he reported severe depression daily with crying, feelings of sadness, lack of sleep, stress, worry due to his situation, and memory problems. (TR 279, 281). He gave a history of abuse of multiple substances but no drug abuse for nine years. He lived with his ten-year-old son for whom he was the primary caretaker. He reported no problems with getting out into the community and no problems with personal hygiene. He reported he completed household tasks, met all his son's basic needs, used the bus system and his own vehicle for transportation, and received food stamps, federal housing aid, and food assistance through a Meals on Wheels program. The examiner noted Plaintiff exhibited average intellectual functioning.

A psychiatrist at the mental health center prescribed an anti-depressant medication for

Plaintiff. One month later, Plaintiff reported the medication was effective, and two months later he reported his mood was improving. (TR 283, 285).

Plaintiff was treated by ARNP Meyer for an ingrown toenail and skin infection in December 2009. (TR 301-302). During this office visit, he reportedly denied changes in strength or range of motion, numbness or tingling, or changes in memory or mood. (TR 301-302).

In April 2010, Plaintiff again reported to his treating mental health clinic that the anti-depressant medication was effective, and a staff member at the clinic noted Plaintiff had begun group counseling for depression and that he had utilized a case manager's assistance for help with housing, clothing, and disability. (TR 306-308). In August 2010, Plaintiff reported his depression was better on medication, and in November 2010, the treating psychiatrist, Dr. Raju, noted Plaintiff's depression was improved. (TR 337, 363). Plaintiff did not show up for psychiatric appointments in July 2010 and November 2010. (TR 341, 362).

In April 2010, Plaintiff was treated at a medical clinic, Health for Friends ("HFF"), where he reported feeling "bad." He reported that Neurontin® helped his neuropathy but did not completely relieve the pain. (TR 373). He complained of swelling in his feet for 2 to 3 days. (TR 373). The examiner noted Plaintiff's neuropathy was improved on Neurontin® and that he may need alterations in his diabetic medications. (TR 373). Plaintiff was referred for a diabetic education program. (TR 372). In July 2010, Plaintiff was treated for an infected ingrown toenail at HFF. (TR 371).

In August 2010, a physician's assistant at HFF noted that Plaintiff's diabetes was improving since he began a new medication, Byetta®, that he exhibited no edema on examination, and that his hypertension was controlled on medication. (TR 370). Plaintiff reported he would be undergoing surgery for an ingrown toenail that month.

In November 2010, Plaintiff reported to a physician at HFF that his "feet hurt so much" he was using a wheelchair but that his pain was manageable during the daytime. (TR 369). Plaintiff reported he slept six hours but then awakened in pain. He was advised to continue the prescribed dosage of Neurontin® ("3600 mg/day") and to take ½ tablet if he awakened during the nighttime with neuropathic pain. (TR 369). In November 2010, Plaintiff reported he was "feeling well overall" and that the nighttime dose of Neurontin® helped. (TR 368). The treating clinic examiner noted that Plaintiff's diabetic neuropathy was "much improved" with Neurontin® and his hypertension was improved on medication. (TR 368).

IV. Analysis of Mental Impairment

Plaintiff contends that the ALJ erred in failing to find that Plaintiff's mental impairment was severe.[3] At step two, the ALJ must determine "whether the claimant has a

---

[3]It appears, as Defendant suggests in his response brief, that Plaintiff incorrectly equated the ALJ's conclusion that Plaintiff's depression was nonsevere as a finding that it did not qualify as a medically-determinable mental impairment. See Plaintiff's Opening Brief, at 3 (noting that "[e]ven the [agency medical consultant] suggested a mental health impairment" existed). However, the ALJ found Plaintiff had a medically-determinable mental impairment due to depression (TR 17), and the ALJ then made the requisite analysis and findings with respect to functional limitations caused by Plaintiff's medically-determinable mental impairment before reaching the conclusion that the mental impairment was not severe. See Chambers v. Barnhart, 389 F.3d 1139, 1144 (10th Cir. 2004)(recognizing that "the mere presence of a condition with no vocationally relevant impact [is

medically severe impairment or combination of impairments." Bowen v. Yuckert, 482 U.S. 137, 140-141 (1987). The ALJ found that Plaintiff has a medically-determinable mental impairment due to depression. Because of this finding, the ALJ was required to

> follow the procedure for evaluating mental impairments set forth in 20 C.F.R. § 404.1520a [and § 416.920a] and the Listing of Impairments and document the procedure accordingly. This procedure first requires the [Commissioner] to determine the presence or absence of "certain medical findings which have been found especially relevant to the ability to work," sometimes referred to as the "Part A" criteria. 20 C.F.R. §404.1520a(b)(2) [and §416.920a(b)(2)]. The [Commissioner] must then evaluate the degree of functional loss resulting from the impairment, using the "Part B" criteria. § 404.1520a(b)(3) [and §416.920a(b)(3)].

Cruse v. United States Dep't of Health & Human Servs., 49 F.3d 614, 617 (10th Cir. 1995)(internal citation omitted). The ALJ is required to "incorporate the pertinent findings and conclusions" in his or her decision, 20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2), and relate the medical evidence to those conclusions. Cruse, 49 F.3d at 618.

The ALJ recognized in the decision that Plaintiff had been diagnosed in September 2009 with major depressive disorder, recurrent, moderate.[4] At that time, Plaintiff sought treatment at a mental health clinic. He was interviewed in October 2009 and a treatment plan was adopted which included medication management with the clinic's psychiatrist, Dr. Raju, medication training, and case management for one year. (TR 279). Contrary to Plaintiff's

---

a] patently inadequate basis for a disability claim").

[4]Although the ALJ indicated in the decision that Plaintiff had been "hospitalized from September 16, 2009 to October 27, 2010," the record does not contain evidence of inpatient treatment for a mental impairment.

10

suggestion, there are no records of treatment of Plaintiff for a mental impairment other than the record of treatment between September 2009 and November 2010 at Central Oklahoma Community Mental Health Clinic ("COCMHC").

The ALJ made findings with respect to the four areas of function required by the regulations for determining the severity of a medically-determinable mental impairment. See 20 C.F.R. §§ 404.1520a, 416.920a. With respect to the area of activities of daily living, the ALJ found that Plaintiff had "mild" limitations resulting from his depression, and the ALJ referred to specific evidence in the record to support this finding. (TR 17). Plaintiff does not cogently argue that this finding conflicts with the record or that there was other probative evidence in the record which should have been considered.

With respect to the area of social functioning, the ALJ found that Plaintiff had "mild" limitations resulting from his depression, and the ALJ referred to specific evidence in the record to support this finding. (TR 17). Plaintiff does not cogently argue that this finding is contrary to the record or that other probative evidence was not considered. With respect to the area of concentration, persistence, or pace, the ALJ found that Plaintiff had "mild" limitations, and the ALJ cited to specific evidence in the record to support the finding. (TR 17). With respect to the area of episodes of decompensation, the ALJ found that Plaintiff had "experienced no episodes of decompensation which have been of extended duration." (TR 17). Plaintiff does not cogently argue that this finding is contrary to the record or that other probative evidence was not considered.

Plaintiff argues that two GAF scores[5] in the record should have been considered by the ALJ. However, these GAF scores of 49 and 52 were made by clinicians at COCMHC at the beginning of Plaintiff's treatment in September 2009. (TR 325, 326). As such, the scores do not reflect persistent low levels of functioning. The ALJ did not err by failing to expressly consider the scores. See Lee v. Barnhart, 117 Fed.Appx. 674,678 (10th Cir. 2004)(unpublished op.)("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work.").

Plaintiff argues that because Plaintiff's anti-depressant medications were adjusted during his treatment at COCMHC, his mental impairment was severe. The ALJ recognized that Plaintiff was prescribed medications and underwent counseling at COCMHC. However, the ALJ reasoned that by April 2010 Plaintiff "reported that his medications were effective in reducing/managing his symptoms of depression" and in October 2010, his treating psychiatrist, Dr. Raju, noted that Plaintiff's depression had improved. (TR 17, 327, 363). The fact that Plaintiff was prescribed medications and that those medications were adjusted, a common circumstance in medical treatment of a non-transitory condition, does not indicate that Plaintiff had a severe mental impairment. Moreover, Dr. Raju did not submit any opinion concerning the severity of Plaintiff's mental impairment. Plaintiff misreads the

---

[5]The diagnosis of mental impairments "requires a multiaxial evaluation" in which Axis V "refers to the clinician's assessment of an individual's level of functioning, often by using a Global Assessment of Functioning (GAF), which does not include physical limitations." Schwarz v. Barnhart, No. 02-6158, 2003 WL 21662103, at *3 fn. 1 (10th Cir. July 16, 2003)(unpublished op.)(citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM IV)(4th ed. 1994), pp. 25-32).

record by suggesting otherwise.

Plaintiff refers to brief office notes made by unidentified clinicians concerning Plaintiff's treatment and group therapy sessions at COCMHC. These notes do describe some of Plaintiff's depressive symptoms. However, these notes are based on either Plaintiff's subjective statements or observations by the clinic's staff members and contain no objective findings of severe mental or functional limitations. The ALJ recognized that Plaintiff had undergone treatment for depression at COCMHC. Although the ALJ did not address in detail the specific symptoms that led to the depression diagnosis, the ALJ made the findings required by the regulations and considered the mental impairment. These findings are supported by the record. There are simply no persistent findings of abnormal mental status examinations, and the record shows that even Plaintiff admitted a fairly high level of functioning. There is substantial evidence to support the ALJ's finding that Plaintiff's mental impairment was not severe, and the ALJ did not err in failing to further discuss these office notes.

## V. Credibility

Plaintiff contends that the ALJ improperly performed a credibility analysis. As Plaintiff acknowledges, the ALJ summarized the medical and nonmedical evidence in her decision, including Plaintiff's testimony at the hearing. Plaintiff faults the ALJ, however, for relying on boilerplate and alleges that the ALJ failed to specify the evidence which caused her to discount Plaintiff's credibility.

At step four, the ALJ must determine whether the claimant retains the RFC to perform

the requirements of all past relevant work. RFC represents "the most [that the claimant] can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). An "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. The claimant bears the burden of proving an inability to perform the duties of the claimant's past relevant work. See Andrade v. Secretary of Health & Human Servs., 985 F.2d 1045, 1051 (10th Cir. 1993).

The assessment of a claimant's RFC generally requires the ALJ to "make a finding about the credibility of the [claimant's] statements about his symptom(s) and [their] functional effects." SSR 96-7p, 1996 WL 374186, at * 1 (1996). Certain factors have been recognized as relevant to this decision, including such factors as medications and their effectiveness, the claimant's attempts (medical or nonmedical) to obtain relief, the frequency of the claimant's medical contacts, the nature of the claimant's daily activities, and the consistency or compatibility of nonmedical testimony with objective medical evidence. See SSR 96-7p, 1996 WL 374186, at * 3; Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). See also 20 C.F.R. §§ 404.1629(c)(3), 416.929(c)(3)(listing factors relevant to symptoms that may be considered by ALJ); Hamlin v. Barnhart, 365 F.3d 1208, 1220 (10th Cir. 2004)(stating ALJs "should consider" factors set forth in SSR 96-7p).

An ALJ is not, however, required to conduct a "formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Employing

14

"common sense" as a guide, the ALJ's decision is sufficient if it "sets forth the specific evidence he [or she] relies on in evaluating the claimant's credibility." Id.; Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012). "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990).

The ALJ's decision includes a summary of the medical evidence as well as Plaintiff's testimony and subjective statements concerning the severity of his impairments. The ALJ stated that "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (TR 20).

The ALJ's use of boilerplate is "insufficient" only "in the absence of a more thorough analysis." Hardman v. Barnhart, 362 F.3d 676, 679 (10th Cir. 2004). The ALJ did not stop after the foregoing boilerplate and provided several reasons, with specific references to the medical record and Plaintiff's testimony and statements in the record, for discounting Plaintiff's credibility. (TR 20-21). These reasons are well supported by the record. No error occurred with respect to the ALJ's credibility determination.

VI. Obesity

Plaintiff contends that the ALJ erred in failing to consider the effects of Plaintiff's

15

obesity. The agency's administrative rulings require an ALJ to consider the effects of obesity when assessing a claimant's RFC and advises that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, "Titles II & XVI: Evaluation of Obesity," 2000 WL 628049, * 1. An ALJ may "not make assumptions about the severity of functional effects of obesity combined with other impairments," but must "evaluate each case based on the information in the case record." Id. at * 6. In determining RFC, an ALJ must "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe[.]" 20 C.F.R. §§404.15459e), 416.945(e); see SSR 96-8p, 1996 WL 374184, at *5.

In this case, Plaintiff did not allege obesity was an impairment that prevented him from working. The record reflects that only one medical professional, ARNP Silverstein-Alpert, indicated in an office note dated September 4, 2009, that Plaintiff was obese. (TR 240-241). Plaintiff's weight was noted to be 262 pounds. (TR 240). In August 2010, a physician's assistant at HFF noted that Plaintiff's weight was 262½ pounds, but there was no mention of obesity. (TR 370). Significantly, no doctor indicated that Plaintiff's weight caused functional limitations or adversely affected any impairments. Plaintiff did not complain about his weight to his treating physicians or clinicians, nor did he testify that obesity caused or exacerbated his impairments. The ALJ did not err in failing to find obesity was a severe impairment or err in failing to consider the effect of obesity in determining Plaintiff's RFC for work. The fact that Plaintiff described using a cane, walker, or wheelchair in the record and in his testimony does not alter the fact that no treating physician

16

or clinician prescribed an ambulatory assistance device for Plaintiff or related his medical need for such an assistive device.

VII. RFC

Plaintiff contends that there was not substantial evidence to support the ALJ's RFC finding. The ALJ made the following findings in connection with the RFC assessment:

> Despite the claimant's allegations, there is no objective evidence of record to support a finding of disability in this case. While the claimant does have diabetes, neuropathy, and hypertension, the overall objective medical evidence of record clearly established that [he] has had significant improvement in his condition with treatment. The claimant's diabetes has been improving with Byetta, his hypertension is controlled, and his neuropathy is improved (Exhibits 5F, page 7 and 15F, page 7). Even though there is some evidence that the claimant occasionally used a cane and, he appeared at the hearing in a wheelchair, there are no objective signs or physical findings to support why he would need an assistive device for ambulating. Furthermore, there is no evidence that an assistive device was prescribed or even recommended. In fact, in a treatment note dated July 13, 2010, it was reported that the claimant had mowed his lawn that past Friday (Exhibit 15F, page 8). In June 2009, the claimant was apparently moving furniture (exhibit 1F, page 15).

(TR 20). The ALJ also points to Plaintiff's "numerous activities of daily living" and the absence of objective evidence of "significant limitations of range of motion, muscle spasm, muscular atrophy from lack of use, significant neurological deficits, weight loss or impairment of general nutrition, and non-alleviation of symptoms by medications." (TR 21). These findings are supported by the record. The ALJ further explained that she had given "great weight" to the opinion of the agency's medical consultant, Dr. Woodcock, who

reviewed the record and determined that Plaintiff was capable of performing light work. (TR 21, 256-263).

Plaintiff's arguments are not well focused. Plaintiff asserts that he is taking a large dose of Neurontin® that is "beyond what the pharmaceutical manufacturer recommends," and that this fact alone detracts from the ALJ's finding of significant improvement in Plaintiff's neuropathic pain. Plaintiff's Opening Brief, at 23. However, as the ALJ noted, Plaintiff's treating physicians and clinicians have repeatedly noted that Plaintiff both acknowledged the Neurontin® was helping his neuropathy and that Plaintiff's neuropathy had improved. In fact, in November 2010, his treating clinician noted that Plaintiff reported he was "feeling well" and that his diabetic neuropathy was "much improved" with Neurontin.® (TR 368). No physician opined that Plaintiff was disabled or that his ability to work was limited by neuropathy or another impairment. The ALJ's RFC finding is well supported by the record, and the ALJ did not err in evaluating the evidence with respect to this determination.

VIII. Consultative Evaluation

Plaintiff contends that the ALJ erred in failing to develop the record by ordering a consultative examination of Plaintiff's vision. The Commissioner "has broad latitude in ordering consultative examinations." Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997). However, there are three recognized circumstances when a consultative examination may be required: "where there is a direct conflict in the medical evidence;" "where the medical evidence in the record is inconclusive;" and "where additional tests are required to

explain a diagnosis already contained in the record." Id.

Plaintiff appears to be arguing that the medical evidence is inconclusive with respect to Plaintiff's vision. In her decision, the ALJ considered Plaintiff's complaint of decreased vision and found "there is no objective medical evidence of record that the claimant has any significant problems or difficulties with his vision. In fact, the claimant reported that he uses a computer, watches television, and in a function report indicated no limitations with his ability to see. . . . Therefore, the undersigned concludes that the claimant's alleged blurry vision is nonsevere." (TR 18).

The record contains the report of an ophthomologist, Dr. Razook, who examined Plaintiff in August 2009. Dr. Razook noted that Plaintiff had background diabetic retinopathy in one eye, that Plaintiff had been advised to return in one month for recheck, and that if the condition was stable he would be given a prescription for new eyeglasses. (TR 222). Nothing in this report indicates that Plaintiff's vision was significantly reduced or not correctable with eyeglasses.

Plaintiff points to his own subjective statements in the record that he had vision difficulties. However, there is no evidence in the record that he returned to Dr. Razook for the recommended follow-up examination or obtained an eyeglass prescription that did not adequately correct his vision. Consequently, the ALJ did not err in failing to order a consultative evaluation of Plaintiff's vision.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter

AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____August 14th_____, 2013, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this ___25th___ day of ___July___, 2013.

*/s/ Gary M. Purcell*
GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE